### BURDICK v. GRAND TRUNK RAILWAY SYSTEM.

MASTER AND SERVANT—WORKMEN'S COMPENSATION ACT—DEPENDENTS—HUSBAND AND WIFE LIVING APART.

Testimony that decedent left his wife about 22 months before his death, and that during that time he did not live with her or contribute to her support, although he occasionally visited her, *held*, to sustain the finding of the industrial accident board that she was not a dependent within the meaning of the workmen's compensation act.

Certiorari to Industrial Accident Board. Submitted October 17, 1919. (Docket No. 66.) Decided December 22, 1919.

Beatrice B. Burdick presented her claim for compensation against the Grand Trunk Railway System for the accidental death of her husband in defendant's

The question as to who are dependents within the meaning of the workmen's compensation acts is discussed in notes in L. R. A. 1916A, pp. 121 and 248, L. R. A. 1917D, 157, and L. R. A. 1918F, 484.

employ. From an order denying compensation, plaintiff brings certiorari. Affirmed.

*Edward Daskam* (*Philip A. McHugh,* of counsel), for appellant.

*W. K. Williams,* for appellee.

BROOKE, J. Certiorari to the industrial accident board. Claimant's husband met with an accident on June 5, 1918, in the course of his employment, resulting in his death while on the way to the hospital. A claim for the injury was seasonably made by claimant, after hearing which the committee on arbitration made an award denying compensation upon the ground that applicant was not a dependent upon George W. Burdick, the deceased, at the time of his death. Upon appeal to the full board further testimony was taken, after consideration of which an award was made by the board affirming the award made by the committee on arbitration. Claimant gave evidence tending to show that her husband left her on August 28, 1916, about 22 months prior to his decease; that from that time although he visited her occasionally up to July 4, 1917, he contributed nothing towards her support. She testified:

"When he came to see me he would live at my expense and go away without leaving me any money. I have been making my own living by keeping roomers at 17 Wyandotte street, Walkerville, Ont."

She further testified:

"*Q.* He left you on the 28th of August, 1916?
"*A.* Yes.
"*Q.* Up until that time had he supported you?
"*A.* Yes.
"*Q.* After the 28th day of August, 1916, Mr. Burdick never contributed toward your support?
"*A.* No.
"*Q.* Not a penny?
"*A.* No.

"*Q.* Where did he live, in Windsor or Walkerville, during the time he lived there after he left you?

"*A.* He lived at Windemere road for a month. I do not know the number.

"*Q.* When did you see Mr. Burdick next after he left you in August, 1916?

"*A.* Well, I saw him on the street. He said he didn't see me. I saw him around Christmas. I saw him before that when he was on the police force.

"*Q.* But you didn't see him to speak to him?

"*A.* No.

"*Q.* And he wasn't at your home?

"*A.* No.

"*Q.* When was the first time that Mr. Burdick came to your home after he left you in the spring?

"*A.* In May, 1917.

"*Q.* Are you sure about the month?

"*A.* I think it was in May, I wouldn't say positive.

"*Q.* How long was he there when he came to see you in May?

"*A.* He came Saturday evening and stayed until Sunday evening.

"*Q.* Was he living at Walkerville at that time?

"*A.* No, he was in Detroit, working for the Grand Trunk Railway.

"*Q.* When was he at your home again after in May?

"*A.* He came the next Saturday.

"*Q.* How long did he stay?

"*A.* He stayed until Monday morning.

"*Q.* And when was he there again?

"*A.* I don't know how often he was there. The last time he came was the 4th of July, I think, I know it was a holiday.

"*Q.* You said it was July 4th in your testimony?

"*A.* It was around the 4th that he came or went there.

"*Q.* This time in July, 1917, was the last time that Mr. Burdick was at your home?

"*A.* Yes.

"*Q.* And you did not visit him at his place of residence in Detroit?

"*A.* No.

"*Q.* Where was he living in Detroit, do you know of your own knowledge?

"*A.* At 355 or 357 Chene street.

"*Q.* He sent you no money from July, 1917, up to the time he was killed?

"*A.* No.

"*Q.* Had you had some trouble when he left you in August, 1916?

"*A.* No, only I was sick.

"*Q.* He just picked up and left?

"*A.* Yes, loaded down with liquor.

"*Q.* You mean he was intoxicated?

"*A.* Yes, otherwise he wouldn't have done what he did.

"*Q.* How old a man was Mr. Burdick, do you know?

"*A.* He was—he told me himself he was forty-seven; and his sister said he was a year younger. The way he tells it he would be forty-eight last October.

"*Q.* You never came over here to live with Mr. Burdick?

"*A.* No, I didn't."

No other testimony as to dependency was offered.

It is contended on behalf of the applicant that giving a fair construction to this testimony applicant was living with her husband at the time of his death within the meaning of the act and therefore entitled to the statutory conclusive presumption of dependency. This contention is based upon the assertion that there was a mere suspension of marital relations for an understood period of time, that is until her husband was financially able to establish a home in Detroit. This position is evidently predicated upon the following testimony given by claimant:

"When he wanted me to come over; he couldn't do much yet, if I would come he would get a house on Jefferson avenue. He said he was going to get $75.00 a month, and start paying for it. I told him if he would go and take a pledge for life, I would go—

"*Q.* It is a fact, as this affidavit was sworn to, that he has not contributed to your support or lived with you since July, 1917, up to the time of his death?

"*A.* No. He did not, but I am certainly dependent upon him just the same, thinking every day, when he

told me he would come back, I was expecting he would come. Then I had to sell the furniture, a piece at a time, to pay the rent.

"Q. Let's get this right on the record. Since July, 1917, you say he has not contributed to your support or lived with you as man and wife?

"A. Since a year ago last summer; that is the last time I seen him.

"Q. July, 1917?

"A. Until I seen him dead. Still, it was his intention to do so."

So far from indicating an agreement between claimant and her husband that they should live separately for a definite time or until he could establish a home in Detroit for her, we think this testimony shows merely that the husband was dissipated and that the claimant was indigent. Taking the claimant's testimony as a whole and giving it the greatest probative force possible, we are yet constrained, in the light of our own decisions, to agree with the conclusion reached by the board. See *Finn* v. *Railway,* 190 Mich. 112 (L. R. A. 1916C, 1142) ; *Roberts* v. *Whaley,* 192 Mich. 133; *Ludwig* v. *Foundry Co.,* 194 Mich. 613; *Kalcic* v. *Newport Mining Co.,* 197 Mich. 364.

The award of the industrial accident board will stand affirmed.

BIRD, C. J., and SHARPE, MOORE, STEERE, FELLOWS, STONE, and KUHN, JJ., concurred.